UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

---

FREDERICK E. BOUCHAT,

                         Plaintiff,

        v.

                                   Civil Action
                                   No. MJG-97-1470

BALTIMORE RAVENS, INC. and
NATIONAL FOOTBALL LEAGUE
PROPERTIES, INC.,

                        Defendants.

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

JUN 1 1 2002

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
NIGHT DROP BOX

---

## PRETRIAL ORDER

---

Plaintiff Frederick E. Bouchat ("Plaintiff") and Defendants Baltimore Ravens, Inc. (the "Ravens") and National Football League Properties, Inc. ("NFLP") (together, "Defendants"), by their undersigned counsel, respectfully submit the following Pretrial Order for the Court's consideration. The parties have reserved the right to present rebuttal and sur-rebuttal evidence if necessary.

## I.    <u>Plaintiff's Statement of Factual Issues and Contentions</u>

The Court bifurcated the case between liability and damages and other relief. The jury found that Defendants' work infringed upon the Plaintiff's work. Plaintiff seeks in this portion of the proceedings the infringers' profits within the meaning of 17 U.S.C. § 504(b). Plaintiff has four alternative methods of computing NFLP's gross revenues for purposes of 17 U.S.C. §

1



504(b). Methods 1 is based on NFLP's audited Financial Statements, Departmental Financial statements, trial balances and general ledger to determine NFLP's gross revenue. Method 1 is also based on so-called NFLP Ranking Reports, the reliability of which has not been established.

Method 2 is similar to Method 1 but utilizes the "Partial Ravens Database" (PRD) produced for this case by NFLP and NFLP's LM Report, both of which have not been established to be reliable. Method 3 utilizes the PRD, Ranking Reports and LMS. Method 4 is based on NFLP's audited Financial Statements, Departmental Financial statements, trial balances, general ledger and is the same as Method 1 except the allocation among the teams to determine gross revenue from the infringing work is based on an equal distribution to each team, given that it cannot be established that the PRD, LM Reports and Ranking Reports are accurate, credible and reliable.

|         | Method 1    | Method 2    | Method 3    | Method 4     |
|---------|-------------|-------------|-------------|--------------|
| NFLP    | $2,665,064  | $2,630,806  | $2,619,296  | $10,234,405  |
| RAVENS  | 1,824,027   | 1,824,027   | 1,824,027   | 1,824,027    |
| TOTAL   | 4,489,091   | 4,454,833   | 4,443,323   | 12,058,432   |

## II.    **Defendants' Statement of Factual Issues and Contentions**

Defendants Baltimore Ravens, Inc. ("Ravens") and National Football League Properties, Inc. ("NFLP") recite herein those facts relevant to Defendants' assertions to be made at trial that: (1) NFLP's gross revenue generated from the sale of merchandise featuring the Flying B Logo is $2,075,832; (2) the Ravens gross revenue generated from the sale of merchandise featuring the Flying B Logo is $541,119; (3) the amount of NFLP's deductible expenses in connection with the sale of merchandise featuring the Flying B Logo is $307,638; (4) all of Defendants' profits generated from the sale of merchandise featuring the Flying B Logo were attributable to factors

other than the Flying B logo.

A.    Background and Business of NFLP

1.    Defendant NFLP is the exclusive licensing agent and representative of the member clubs ("Member Clubs") of the National Football League ("NFL"), including the Ravens, for use of their trademarks for commercial purposes, including the full team name Baltimore Ravens, the nickname "Ravens," uniform designs and other identifying words or symbols.

2.    NFLP is charged with promoting, licensing, protecting against infringement and, in some cases, designing the trademarks of the Member Clubs.

3.    Defendant Ravens owns and operates the National Football League franchise in Baltimore known as the Ravens.

4.    The Ravens publicly unveiled the Flying B Logo on June 5, 1996.

5.    The Flying B Logo prominently displays the word "Ravens", a trademark owned by the Baltimore Ravens and exclusively licensed to NFLP.

6.    The only revenue that is potentially subject to recovery in this proceeding is revenue relating to the sale of licensed merchandise bearing the Flying B Logo.

7.    The method by which NFLP earns its revenue is through licensing the trademarks of the NFL and its Member Clubs to various entities.

8.    These entities enter into Retail License Agreements with NFLP, pursuant to which licensees are authorized to use the marks of the NFL and each of the Member Clubs.

9.    In exchange, licensees agree to pay NFL a certain percentage of the sales revenue per item sold.

10.    Prior to offering products for sale in the marketplace, licensees are required to obtain approval of those products by NFLP for purposes of quality control.

11.    Licensees must submit quality control approval forms containing depictions and/or descriptions of the products to be offered in order to ensure that licensees correctly depict the NFL trademarks, including those of the Member Clubs.

12.    Once approval has been received from NFLP, the licensees may begin offering the approved products for sale.

13.    During the term of the license, each licensee will remit to NFLP on a monthly basis retail sales reports, also known as royalty reports, which reflect sales of licensed merchandise

during that specific month.

14. The royalty report form requires information to be provided concerning the number of units of products sold bearing the marks for each particular Member Club.

15. Licensees do not report sales information pertaining to any specific, individual trademark of a Member Club.

16. The data contained in the monthly royalty reports is in turn recorded in the licensee management royalty database maintained by NFLP, which stores sales information, by licensee.

17. Even if licensees are late in reporting sales of merchandise, the royalties are recorded in the proper month of sale in the royalty database.

18. The NFL royalty database can be queried to ascertain the amount of royalty revenue that is attributable to the sale of licensed merchandise bearing the marks of each Member Club.

19. The NFL royalty database forms the basis from which various reports are generated and used by NFLP in the ordinary course of business, such as team ranking reports.

20. The NFL royalty database does not maintain information based on each individual trademark of each Member Club.

21. NFLP has an auditing program by which it audits certain licensees in connection with royalty payments from the sale of NFL merchandise.

22. In addition, the royalty database is subject to audit by outside independent auditors.

23. Defendants authorized licensees to use the Flying B Logo beginning after June 5, 1996 and continuing through March 31, 1999.

24. In December of 1998, NFLP advised licensees that they could no longer use the Flying B Logo.

25. Shortly thereafter, NFLP advised licensees that they must destroy all products bearing the Flying B Logo prior to March 31, 1999.

26. Licensees remitted royalty payments to NFLP in connection with the sales of merchandise featuring the Flying B Logo from June 5, 1996 until March 31, 1999.

27. Royalty revenue received by NFLP from the sale of merchandise featuring the Flying B Logo is included in NFLP's books and records, including the royalty database.

28. Numerous products bearing Ravens logos, such as team jerseys, sold during the relevant time period did not bear the Flying B Logo.

4

29.    The revenue that is recorded in the Ravens portion of the licensee royalty database includes a substantial amount of revenue that is not attributable to Defendants' use of the Flying B Logo.

30.    Licensees do not enter into contracts with NFLP because of the aesthetic value of any one particular logo.

31.    The value of a retail license agreement to NFLP's licensees is not derived from the creative elements of any one Member Club logo.

32.    A license from NFLP is valuable because of the high quality of the NFL's on-field product, the League's illustrious history, and the popularity and excitement of NFL football.

33.    It is the opportunity to tap into the goodwill of the NFL and its Member Clubs that is, and continues to be, the causal factor in drawing such licensees to the NFL and in their remaining affiliated with the League.

34.    No licensee ever bargained for the right to terminate, void, amend, alter, rescind or modify a contract if the NFL ceased using any one logo of any one Member Club.

35.    After the Browns moved from Cleveland to Baltimore, no licensee sought to renegotiate, amend, terminate, rescind or modify a license contract with NFLP because the Browns logo was not being used by that entity.

36.    After the Ravens ceased using the Flying B Logo, no licensee sought to renegotiate, alter, amend, terminate, rescind, or otherwise modify a license contract with NFLP on that basis.

37.    NFLP licensees have come to expect that Member Clubs will change certain logos over the term of a license agreement.

38.    None of the many sophisticated business entities that enter into relationships with NFLP require Member Club logos to remain the same during the term of the contract.

39.    When negotiating business arrangements with potential licensees, NFLP does not focus on the aesthetics of team logos as a selling point.

40.    NFLP markets the ability of licensees to tap into the goodwill and excitement of NFL football, and to provide the licensee the ability to become associated with this immensely popular sport.

B.     <u>Revenue and Expenses Relating to Defendants' Use of the Flying B Logo</u>

40.     Defendants retained Dr. Daniel J. Slottje, Ph.D. to calculate Defendants' gross revenues less deductible expenses relating to the sale of merchandise bearing the Flying B Logo.

41.     Dr. Slottje is the Principal in charge of KPMG LLP's Southwest Area Forensic and Litigation Services practice and is a tenured Professor of Economics at Southern Methodist University.

42.     Dr. Slottje is a widely published and respected author and is recognized as one of the foremost scholars in his field, ranking in the top three in the world (out of more than 5000 practitioners) in applied econometrics.

43.     Dr. Slottje has been qualified as an expert on numerous occasions in both federal and state court proceedings to testify concerning econometric models and in calculating profits in intellectual property cases.

<u>Calculation of NFLP Revenue</u>

44.     In calculating the amount of revenue received by NFLP from the sale of merchandise featuring the Flying B Logo, Dr. Slottje first evaluated the total number of units sold by NFLP with a Baltimore Ravens logo and then attempted to identify those units sold without the Flying B Logo.

45.     Dr. Slottje accomplished this analysis by reviewing source documents including the Retail Sales Reports, Licensee Management Reports, general ledgers and internally generated income statements from NFLP.

46.     Dr. Slottje validated this data by comparing the units and revenue included in the NFLP database to the respective "Ranking Reports" maintained by NFLP.

47.     Dr. Slottje determined that the two separate revenue and unit reports tie very closely.

48.     To ensure that all recoverable revenues were included in his analysis, Dr. Slottje added $12,127 in premium royalties and $2,450 from Sports Illustrated direct marketing royalties.

49.     The premium and Sports Illustrated direct marketing royalty revenues were generated from the sale of Ravens merchandise, but were recorded in the sponsorship and publishing departments, respectively.

50.     Dr. Slottje then deducted $7,113 in revenue which was generated prior to June 5, 1996 during the 1996 Season Year – the date that the Ravens adopted the Flying B logo – as merchandise sold prior to June 5, 1996 could not have contained the Flying B Logo.

51.   After deducting this amount, Dr. Slottje concluded that the net revenue from the sale of Ravens merchandise received by NFLP during the relevant time period was $2,227,638.

52.   From this net revenue figure, Dr. Slottje considered whether he could then deduct revenue from the sale of merchandise that did not bear the Flying B Logo but, instead, bore one of the other several logos used by the Ravens during the relevant time period or just the word mark "Baltimore Ravens."

53.   Because NFLP's records track the sale of merchandise by team, but not by particular logo, Dr. Slottje concluded that he could only deduct revenue relating to the sale of authentic and replica jerseys, as the Ravens' jerseys during the relevant years did not bear the Flying B Logo.

54.   Dr. Slottje determined that $151,806 in royalties were attributable to the sale of authentic and replica jerseys.

55.   Other than jerseys, Dr. Slottje's analysis assumes that all revenue received by NFLP from the sale of Ravens merchandise bore the Flying B Logo.

56.   NFLP's gross revenue for use of the Flying B Logo during the relevant time period is $2,075,832.

57.   The $2,075,832 necessarily includes revenue relating to Ravens merchandise that did not bear the Flying B Logo.

58.   Plaintiff has not and cannot offer any evidence to show that any of this revenue was generated because of the Flying B Logo.

Calculation of Ravens Revenue

59.   Dr. Slottje next considered the amount of revenue received by the Ravens in the form of commissions from the sale of novelty items sold at the Ravens' stadium by concessionaires Service America Corp. ("SAC") and Fine Host Corporation ("Fine Host").

60.   This calculation was based upon a review of agreements between the Ravens and the concessionaires and documents such as post event stand sheets reflecting sales of merchandise by concessionaires.

61.   SAC was the exclusive concessionaire for Ravens home games during the 1996 and 1997 seasons, and Fine Host was the exclusive concessionaire for Ravens home games during the 1998 season.

62.   Because SAC had gone out of business, Dr. Slottje did not have adequate records to determine what merchandise was sold bearing the Flying B Logo, as opposed to other Ravens logos, for the 1996 and 1997 seasons.

63.   Dr. Slottje assumed that all of the novelty merchandise sold by SAC during those two seasons featured the Flying B Logo.

64.   Based on his review of various documents and conversations with Fine Host employees, Dr. Slottje identified $27,549 in commission payments by Fine Host to the Ravens in connection with sale of novelty merchandise in 1998 relating to merchandise that did not bear the Flying B Logo, and deducted this amount accordingly.

65.   Where there was any doubt, Dr. Slottje assumed that the novelty item sold bore the Flying B Logo.

66.   The total figure of Ravens' revenue generated from the sale of novelty items during the relevant time period is $541,119, which again includes merchandise sold bearing Ravens indicia other than the Flying B Logo.

67.   Plaintiff has not and cannot offer any evidence to show that any of this revenue was generated because of the Flying B Logo.

Calculation of Expenses

68.   Dr. Slottje analyzed the expenses incurred by NFLP for the years 1996 through 1998.

69.   Expenses were captured on NFLP's consolidated as well as departmental income statements for the years 1996 through 1998 relating to NFLP's consumer products department.

70.   Dr. Slottje included expense items that are directly related to the sale of NFL merchandise.

71.   Dr. Slottje concluded that the expenses that are directly associated with the licensing, marketing, and promotion of Ravens merchandise containing the Flying B Logo is 14.82 percent of sales during the relevant time period, or $307,638.

72.   Deducting the $307,638 in expenses yields a total of $2,321,440 in revenue generated by NFLP and the Ravens from the sale of merchandise potentially bearing the Flying B Logo.

73.   The $2,321,440 includes revenue from sales of Ravens merchandise that did not bear the Flying B Logo.

C.   Profits Attributable to the Flying B Logo

74.   All of Defendants' profits generated from the sale of merchandise bearing the Flying B Logo were attributable to factors other than the Flying B Logo.

75.   In addition to the factual evidence, the scientific studies conducted by Dr. Slottje and Dr. Wind demonstrate there is no connection between the use of a particular logo and the sales of merchandise of any particular Member Club.

76.   The aesthetic features of a particular team logo do not influence merchandise sales.

77.   Other factors, including, but not limited to, the goodwill of the NFL, the goodwill of the Member Club, the goodwill of the licensee selling the product, fans desire to support their team, ticket sales, the won-loss record of the Member Club, other logos appearing on the product, style of the product, functionality of the product, Super Bowl championship victories, team reputation, individual player statistics, the excitement generated by a new franchise, and the like are the types of factors that impact merchandise sales.

Analysis of Dr. Slottje

78.   Dr. Slottje ascertained the amount of profits attributable to the Flying B Logo separate and apart from the logo's affiliation with the Ravens and the NFL.

79.   This was done by using two separate generally accepted regression methods to determine the relationship between variables that could influence sales and NFL team merchandise sales revenue.

80.   The variables considered by Dr. Slottje in connection with this regression analysis include, but are not limited to, team record, whether the team has a long tradition, the impact of winning the Super Bowl championship, points scored by a team, stadium capacity, tickets sold, conference played in, division played in, team relocations, and whether the team is new.

81.   By including "logo" as a variable in the model, Dr. Slottje assumed that a logo change would have an impact on the sale of NFL team merchandise.

82.   To ensure that the model was as robust as possible, Dr. Slottje also adjusted to account for socio-economic characteristics of a given city.

83.   Based on the variables selected, Dr. Slottje constructed a panel data set (data where multiple observations are each observed for multiple years) for the 31 NFL franchises spanning the years 1991 through 2000.

84.   To analyze the statistical relationship between logo changes and sales revenue, while simultaneously adjusting for other franchise attributes, Dr. Slottje used well-recognized and generally accepted econometric techniques.

85.   Ordinary Least Squares ("OLS") is a technique that is used to fit a line to examine the relationship between sales and other factors.

86.   Dr. Slottje also employed the more complex fixed effects model to take advantage of the panel set of data to control for time invariant unobserved attributes of franchises (such as fan loyalty).

87.   Employing these techniques, and controlling for other variables, Dr. Slottje concluded that a logo change has no effect on the sales revenue of an NFL Member Club in the next year.

88.   Mathematic results from the regression analysis demonstrate that in both models there is no effect of logo changes on driving sales of NFL merchandise by team.

89.   Dr. Slottje's model further demonstrates that factors which intuitively have a correlation with NFL merchandise sales revenue, such as team wins, Super Bowl championships, and ticket sales, were found to have a positive impact on merchandise sales revenue.

90.   The results of Dr. Slottje's econometric analysis comport with common sense – the value of an NFL Member Club derives largely from its membership in the NFL and its success within the League.

91.   Dr. Slottje also examined several other factors which assist in determining what reasonable compensation might be afforded to Plaintiff for use of the Flying B Logo.

92.   A significant amount of team merchandise sales can be attributed to a team's membership in the widely popular NFL.

93.   NFLP has incurred significant advertising expenses associated with the promotion of NFL brand awareness, consumer loyalty to favorite teams, and with marketing and promotional efforts aimed at driving merchandise sales.

94.   NFLP has made substantial investments to promote the NFL and the Ravens.

95.   Promotional and marketing expenses alone total $33.3 million for 1996, $32.4 million for 1997, and $29.6 million for 1998.

96.   Such expenditures, along with other marketing and promotional activities, and careful development of the NFL image, create consumer demand and also support the sales and promotional efforts of the Ravens.

97.    Ravens merchandise sales decreased each year from 1996 until the year they played in and won the Super Bowl championship game.

98.    Dr. Slottje examined costs incurred by NFLP associated with outside designers in developing other team logos.

99.    Outside designers are paid by NFLP in the form of flat fees.

100.   NFLP expended $67,205 for outside design costs associated with the Houston Texans.

101.   NFLP expended $96,730 for outside design costs associated with the Tennessee Titans.

102.   NFLP expended $10,800 for outside design costs associated with Super Bowl XXXV.

103.   The costs incurred by NFLP associated with the Tennessee Titans and the Houston Oilers design projects are particularly helpful in determining reasonable compensation for Plaintiff, and based on these situations Plaintiff should be due no more than $96,730.


Analysis of Dr. Wind

104.   Defendants retained Dr. Yoram Wind, Ph.D. to design and conduct a survey to determine the relative impact of the Flying B Logo on consumers' decisions to buy Baltimore Ravens' products.

105.   Dr. Wind is a world renowned expert in the field of consumer psychology and marketing research.

106.   Surveys such as the one conducted by Dr. Wind accurately reflect the marketplace and are routinely accepted by courts as evidence of measuring consumer perceptions.

107.   Surveys such as the one conducted by Dr. Wind are routinely accepted by courts in actions involving damages for copyright infringement.

108.   Dr. Wind based his survey on personal interviews of more than 1000 consumers who have recently bought or intend to buy professional sports related apparel or products.

109.   The respondents were randomly drawn from a representative sample of target consumers in the Baltimore metropolitan area and 12 randomly selected metropolitan areas with NFL teams, three per census area.

110.   An independent research firm verified Dr. Wind's survey.

111.   Dr. Wind retained Data Development Corporation ("DDC"), an experienced and reputable marketing research firm that Dr. Wind has worked with for many years, to collect the data in connection with this study.

112.    Dr. Wind personally supervised all aspects of the data collection, preparing specific instructions for both research supervisors and professional field interviewers retained by DDC.

113.    The survey was conducted under double-blind conditions, meaning that neither the interviewer nor the respondent knew the purpose of the survey or the identity of its sponsor.

114.    After being randomly selected for an interview, potential respondents were screened with a series of questions designed by Dr. Wind.

115.    The screening questions were designed to ensure that only qualified respondents (respondents within the defined universe) were included within his sample.

116.    In order to be included in the survey, the respondent must have bought a cap, t-shirt or other item with a professional team name/logo in the past year or intend to buy a cap, t-shirt or other item with a team name/logo within the next three months.

117.    The full name, address and phone number of each respondent who satisfied the screening criteria were recorded on the front of the screening questionnaire.

118.    The interviewers were required to sign and date the screening questionnaire.

119.    Once screened for eligibility, respondents were shown one of four t-shirts: 253 respondents were shown the "Test cell," a t-shirt bearing the Flying B logo; 248 respondents were shown "Control 1," a t-shirt bearing the Ravens' current logo design and name; 251 respondents were shown "Control 2," a t-shirt bearing a logo design and name considered by the Ravens but which has never been used; and 249 respondents were shown "Control 3," a t-shirt bearing the Baltimore Ravens' name by itself with no logo design.

120.    After viewing one of the four t-shirts, the interviewer then asked the respondent one key, non-leading question, making note of the answer given on the survey questionnaire: "Would you buy this T-shirt if it were offered at a price that is acceptable to you?"

121.    Each respondent was then asked a series of "control" questions designed to ascertain whether various factors affected the consumers' decisions to buy or not to buy the product.

122.    Pursuant to Dr. Wind's instructions, once the interview was completed, the respondents were asked to sign the main questionnaire.

123.    Additionally, Dr. Wind required the interviewer to certify the accuracy of the responses recorded on the questionnaire.

124.    After the conclusion of the study, a statistical analysis was performed by Dr. Abba Krieger to ascertain whether the "control" factors impacted the study.

125.    In addition, demographic analysis of the respondents revealed there were no statistically significant differences in the demographic make-up of the four cells sampled.

126.    The results of the survey were as follows:  60% of the respondents indicated they would buy the shirt featuring the Flying B logo; 67% of respondents indicated they would buy the shirt featuring the Ravens' current logo; 51% of respondents indicated they would buy the shirt featuring a Ravens logo that had been considered but never used; and 59% of respondents said they would buy the shirt bearing merely the words "Baltimore Ravens."

127.    There was no statistically significant difference between the percentage of respondents who would purchase the Flying B logo, or any other logo used in the study.

128.    To ensure the accuracy and integrity of the survey data, Dr. Wind retained an independent marketing research firm, Park Research, to validate the study.

129.    Park Research attempted to contact each respondent at least twice to verify that the survey was actually conducted.

130.    53% of survey respondents were actually verified.

131.    The 53% validation far exceeds the commonly accepted industry standard of 15% verification.


D.    Plaintiff Improperly Claims Entitlement to
       Revenue Not Attributable to the Flying B Logo[1]

132.    Plaintiff also seeks to recover revenue generated from:  1) minimum guarantee shortfall payments; 2) the sale of other licensed merchandise, including video games, trading cards, and products bearing multiple club marks; 3) "free" merchandise provided to the Ravens; 4) game program sales; and 5) the sale of souvenir cups.

133.    None of these revenues were generated because of the Flying B logo, and thus they should be excluded from any potential award to Plaintiff.

---

1 Defendants have moved for partial summary judgment to preclude these issues from being raised at trial.  (See Defendants' Motion for Partial Summary Judgment to Exclude Remote Revenues)  Defendants do not intend to elicit testimony about these issues if their motion is granted.

Shortfall Payments

134.  In connection with certain license agreements, NFLP negotiates with licensees to be paid a minimum royalty guarantee for sales of products for all NFL clubs combined.

135.  The licensee agrees to pay NFLP a minimum amount in connection with a particular license, regardless of the amount of royalties actually earned from the sale of licensed merchandise.

136.  A licensee does not base its decision to provide a minimum royalty guarantee to NFLP on the logo of any particular Member Club.

137.  These payments are based on the goodwill and marketing exposure that a licensee would generate from its association with the NFL and are made regardless of the logo used by a particular Member Club.

138.  No minimum royalty guarantees were ever modified or renegotiated as a result of a Member Club's logo change.

139.  If a licensee fails to generate sufficient royalty revenue to cover this minimum amount, the licensee must pay the difference between the minimum guarantee amount and the total amount of royalties generated ("Shortfall Payment").

140.  Plaintiff cannot demonstrate any causal relationship between Shortfall Payments made to NFLP and the Flying B Logo.

Trading Cards

141.  Revenue from the sale of trading cards is not attributable to the Flying B logo.

142.  There is no causal connection between Defendants' use of the Flying B Logo and revenues generated from the sale of trading cards depicting an NFL player.

143.  Trading cards are wrapped in packaging that does not identify the specific player cards contained within.

144.  A consumer purchasing trading cards does not know which cards are contained within any given pack, and hence there is no guarantee that anyone purchasing a pack of trading cards will obtain even one card depicting a Ravens player.

145.  During the relevant time frame, trading card packaging did not depict any players in a Ravens uniform bearing the Flying B Logo.

146.  Given that no consumer could possibly know whether they were purchasing a card bearing the Flying B Logo, such logo could not affect a consumers' decision to purchase the cards at the point of sale.

14

147. Although trading cards are sold individually in the secondary market, NFLP receives no royalty from such sales.

148. NFLP only receives royalties from the sale of wrapped boxed sets of trading cards.

149. Consumers purchase trading cards because of, inter alia, the goodwill associated with the NFL or a Member Club, not because of a specific logo.

Video Games

150. Revenue from the sale of video games is not reasonably related to the Flying B Logo.

151. The entire purpose of a video game is to play it – the aesthetic quality of any particular logo does not enhance the quality of the game experience for those playing the game and thus does not impact the sales of video games.

152. During the relevant time frame, video game packaging did not depict any players in a Ravens uniform bearing the Flying B Logo.

153. Companies in the video game industry attempt to create products that they describe in terms of "action simulation," a concept under which programmers develop video games that appear as much like a television broadcast as possible.

154. The use of the Flying B Logo in connection with video games essentially duplicates that which appears in a television broadcast.

155. As with television broadcasts of NFL games and game tickets, it is inconceivable that anyone would pay to purchase a video game merely because it displayed the Flying B Logo.

Products Bearing Multiple Club Marks

156. Revenues from products bearing multiple club marks were not generated because of the Flying B Logo.

157. Products that bear multiple club marks contain the marks of each of the (at the time) thirty-one Member Clubs.

158. Given that all Member Club marks appear on the product, it is plain that no one would purchase such a product merely because of the aesthetics of one particular logo, particularly given the fact that products bearing individual logos are available for purchase.

159. Consumers purchase products bearing multiple club marks to show an affiliation with the entire NFL.

15

160. The aesthetic representation of any one particular Member Club logo simply does not have any bearing on the sale of such products.

Revenue Attributable to "Free" Merchandise

161. During the relevant time period, the Ravens received some merchandise from NFLP licensees such as helmets, practice jerseys, equipment, caps, apparel, and other items at no charge to be used, and not sold.

162. No licensee provides such merchandise to the Ravens because of the Flying B Logo.

163. The Ravens did not generate any revenue from merely using such free merchandise.

164. The Flying B Logo had no impact on the decision of licensees to provide such merchandise to Defendants.

Game Programs

165. Sales of game programs were not attributable to Defendants' use of the Flying B Logo.

166. Game programs use the Flying B Logo merely to identify the team playing.

167. It is inconceivable that anyone would purchase a program at the game merely because it included the Flying B Logo.

Concession Sales

168. During the relevant period, concessionaires sold soft drinks in 32 oz. plastic cups bearing the Flying B Logo, along with other logos.

169. No revenue was generated from the sale of soft drinks contained in plastic cups bearing the Flying B Logo because of the Flying B Logo.

170. Plaintiff cannot demonstrate a reasonable relationship between revenue generated from the sale of 32 oz. soft drinks sold in plastic cups bearing the Flying B Logo, among other logos, and the subject logo.

171. During the relevant period, soft drinks were sold in 20 oz. cups which did not bear the Flying B Logo for $2.50 (or 12.5 cents per ounce).

172. The 32 oz. cups bearing the logo sold for $3.75 (or 11.7 cents per ounce).

173. On a per-ounce basis, the cups bearing the logo cost less than the cups without the logo.

174. All 32 oz. soft drinks were sold in a plastic cup bearing several logos in addition to the Flying B Logo.

175.   If a consumer chose to purchase a 32 oz. soft drink, there was no choice but to purchase the 32 oz. soft drink contained in the cup bearing the Flying B Logo.

176.   Concessionaires did not receive a premium in connection with the sale of soft drinks contained in the cups bearing the Flying B Logo.

177.   Concessionaires paid the same royalty rate regardless of whether the cup bore the logo.

178.   Given that concessionaires did not generate additional revenue through the sale of soft drinks sold in the plastic "souvenir" cup, the Flying B Logo could not and did not have a positive effect on the amount of revenue generated from the sale of 32 oz. soft drinks at Ravens games.

179.   Any desire on the part of the consumer to purchase a "souvenir" from a Ravens game was due to the goodwill of the Ravens and the NFL, not to any intrinsic aesthetic value of the Flying B Logo.

180.   Exclusive concessionaires, such as the Ravens concessionaires here, can command a higher price for soft drinks sold to fans inside the stadium.

181.   Such higher prices surely are not attributable to the Flying B Logo – it is attributable to the fact that fans want to be inside the stadium in order to watch the excitement of NFL games in person.

182.   Thus, the resulting profits are attributable merely to the fact that the soft drink was sold inside the stadium.

III.   <u>Plaintiff's Rebuttal Statement of Facts and Contentions.</u>

Plaintiff's rebuttal to Defendants' assertions that the revenues in question were generated solely by NFL goodwill was that Defendants used the creative elements and originality of Plaintiff's artwork to create business goodwill in Baltimore and those who identified with Baltimore.  Defendants used Plaintiff's creativity and originality because it would help promote the new team in Baltimore and sell its products.  Defendants' own stated reasons of what the creative elements gave them, as well as evidence of  the historical background of the NFL and its reputation in Baltimore, the national uproar over

the move of the Modell franchise, made the creative elements of Plaintiff's work all the more important to the Modell franchise, particularly in light of the extreme time pressures under which Defendants had to labor to rush their products to market.  THIS was the value added by Plaintiffs's creativity and originality to the infringing work.

NFLP's and the franchise's objective was to create a completely new corporate identity with which the people of Baltimore could associate, while simultaneously meeting the needs of NFLP's manufacturers and other business partners, i.e., licensees. The logo design was part of the NFLP Baltimore identity project.   David Modell, the Ravens' Vice President and now President, is on record as stating that particular consideration was given "to how the logo might reflect our fans' perception of themselves and their city, how our logo might reflect this city's heritage, and how the logo reflects the desired personality of the Ravens' team."

Bruce Burke, NFLP Vice President and Creative Director, told Jon Morgan on June 5, 1996 that the municipal emphasis of the logo's design was a response to the fans' reactions to the number of franchise relocations and to Jack Kent Cooke's desires that the mark be unique to Baltimore given its proximity to his franchise and "to avoid putting too much emphasis on the bird because of the widespread avian influence in the NFL," i.e., Falcons, Seahawks, Cardinals and Eagles.   "We worked with a bird symbol, and the more we looked at it, we realized that it wasn't unique and wouldn't be enduring," Burke said, "Birds have been done."   Burke also said that a crest or shield, however, harkens to the heraldry in Maryland's colonial history, something the  NFLP's researchers

18

discovered was popular among potential fans here, and was being used only by the Raiders.  As Defendants' own expert, Craig Ziegler, put it: "It's [the logo] all about branding, it's about selling tickets and selling merchandise.  It needs to be appealing to a wide variety of folks."

The historical reputation within Baltimore and Maryland was that under cover of darkness on a wintry night in 1984, Robert Irsay surreptitiously loaded  the Baltimore Colts into Mayflower moving vans and pirated the franchise to Indianapolis.  A significant segment of the Maryland community considered Irsay's action to be condoned by the League and to be the theft of a public treasure in violation of a public trust. When William Donald Schaefer, the Mayor of Baltimore in 1984, became Governor in 1986, he introduced legislation authorizing the construction of new baseball and football stadia for professional baseball and football.  With the legislation in place, however, Baltimore was left "waiting at the altar" by the National Football League and was particularly affronted by the League during its expansion in 1993 when Jacksonville, Florida and Charlotte, North Carolina were awarded franchises. The owners of other franchises flirted with Baltimore.  Tagliabue's reputed comment that Baltimore should build a museum instead of a stadium was well-publicized and known for years within the Baltimore community and made an indelible impression on the community.   Many Baltimoreans perceived Commissioner Tagliabue as the epitome of the League's duplicity, moneyed arrogance and greed, and the League enjoyed little goodwill in Baltimore. At one point, the Maryland Stadium Authority considered filing an anti-trust suit against the National

19

Football League.

As Robert Irsay had been vilified in Baltimore in 1984, Modell was instantly vilified in Cleveland for wanting to move one of the most fabled, faithfully-followed and supported franchises to another city for money.  In the words of Jon Morgan, Modell became the NFL's "darkest villain."  Cleveland's mayor publicly accused Modell of dishonesty.  The mood and public perception of Modell in Cleveland was reflected in two articles appearing in the December 4, 1995 issue of *Sports Illustrated*, in which Modell was caricatured on the magazine's cover sucker-punching a stuffed dog wearing a Browns helmet with a caption the "Battle for the Browns–Art Modell Sucker-Punched Cleveland but the City is Fighting Back."

As a consequence of litigation instituted by the City of Cleveland, the League did not approve the move of the franchise until late February 1996.  One of the conditions for settlement of the litigation was that Modell would leave all the heritage and identity of the Cleveland Browns in Cleveland, which would be assumed by an expansion team that Cleveland was to get in 1999.  Unlike the Indianapolis Colts who took with them the heritage and brand of the Baltimore Colts, the Modell franchise was simply that-- Modell's franchise without the brand of the Browns' orange helmet or the heritage and goodwill generated by the gridiron exploits of such football legends as Jimmy Brown, Otto Graham, Lou Groza or the others players with whom that helmet had been associated.  By contrast, while there were many super fans and apologists for the NFL who enthusiastically welcomed the franchise, a ~~substantial~~ portion of the Maryland

community derided the amount of public resources appropriated for the move and the new stadium that would result in increased ticket prices and other revenues. Others remained Colt fans; and still others were simply ashamed. In summary, the new Baltimore franchise had the task of creating a completely new identity and business goodwill in Baltimore in the face of negative public concerns and perceptions about the new franchise's–or, for that matter, any NFL franchise's--loyalty to the City and the team's fans, given the loss of the Colts to Indianapolis, the relocation or threatened relocation of NFL franchises and Baltimore's perception of the League personified by Tagliabue.

The design team was under extreme pressure in order to meet the tight deadlines imposed by the season's kick-off and NFLP's manufacturers. The design team worked inordinate hours and  had a "very short window" to prepare for first phase presentation. The design team had a little more than two weeks to come up with proposed logos for presentation on April 16th and thereafter to refine the direction in which the proposed logos were going by May 3, 1996, when they would be shown in Baltimore.  Plaintiff's value to the identity project and logo was that he provided Defendants something unique and native to Baltimore within the prescribed time frame.

The analysis of Defendants' expert is fundamentally flawed, based on unreliable data, and is not credible.

IV.    **Statement as to Other Claims**

There are no counterclaims, cross-claims or third party claims asserted.

V.       **Amendment of Pleadings**

There are no proposed amendments to the pleadings.

VI.      **Issues in the Pleadings to be Abandoned**

Plaintiff has not indicated whether he wishes to abandon any issues in the pleadings.

Defendants do not abandon any issue raised in their pleadings.

VII.     **Stipulations**

Plaintiff and Defendants have had discussions, but have not yet agreed to, any stipulations as to trial exhibits.

VIII.    **Damages and Other Relief**

Plaintiff has not yet specified his requested relief.

Defendants' requested relief is that Plaintiff be granted a nominal award.

IX.      **Documents**

The parties are to mark for identification prior to trial any documents and records that they intend to offer at trial.  Plaintiff will be limited except for rebuttal and impeachment to the following documents and records at trial:

1.       Plaintiff's drawing with note to John Moag.

2.       Financial Statements Produced By NFLP containing bates stamp numbers NFLPD0001 through 0006.

3.       Six-Photographs of Quality Control Form Boxes-February 18, 2002  (a-i)

4.       Audited Financial Statements of NFLP as of March 31, 1997, Bates: NFLPD 1459 to 1480.

5.       Audited Financial Statements of NFLP as of March 31, 1998, Bates: NFLPD 1435 to 1458.

6.    Audited Financial Statements of NFLP as of March 31, 1999, Bates: NFLPD 1411-1434.

7.    Internal consolidated and departmental financial statements of NFLP for the year ended March 31, 1997 containing bates stamp numbers NFLPD 2090 to NFLPD 2099.

8.    Internal consolidated and departmental financial statements of NFLP for the year ended March 31, 1998 containing bates stamp numbers DS001344 through DS001362.

9.    Internal consolidated and departmental financial statements of NFLP for the year ended March 31, 1999 containing bates stamp numbers DS001363 through DS001379.

10.   Internal consolidated and departmental financial statements of NFLP for the year ended March 31, 2000 containing bates stamp numbers DS001380 through DS001398.

11.   Trial balances of NFLP for the year ended March 31, 1997, containing bates stamp numbers DS000740 through 001062.

12.   Trial balances of NFLP for the year ended March 31, 1998, containing bates stamp numbers DS001063 through 001279.

13.   Trial balances of NFLP for the year ended March 31, 1999 containing bates stamp numbers DS001280 through DS001343.

14.   Trial balance of BRI or BRLP for the year ended January 31, 1997, 1998, and 1999 containing bates stamp numbers DS002296 through DS002333.

15.   Printout from the disk provided by NFLP represented to contain the general ledger for the accounts included in the consumer products departmental financial statements (without Quarterback Club) and containing bates stamp number NFLPD 2345.

16.   The disk provided by NFLP represented to contain the general ledger for the accounts included in the consumer products departmental financial statements (without Quarterback Club) and containing bates stamp number NFLPD 2345.

17.   Photographs of General Ledger (a-j).

18.   Quality Control forms, NFLPD 0030; 0038; DS 2507-2548; 2627-2628.

19.   Quality Control forms, NFLPD 1493 through NFLPD 1873

20.   Quality Control forms, NFLPD 1874 through NFLPD 2079

21.   Quality Controls Forms – NFLPD 2104 through 2153.

22.   Quality Control Form-DS 002506 through 002548

23.   Ravens Style Guide NFLPD 8262-63

24.   Ravens Style Guide NFLPD8264-65

25.   Ravens Style Guide NFLPD8266-67

26.   Ravens Style Guide-color

27.   Retail Sales Reports NFLPD 0732, 0851, 1276

28.   Licensee Contact List DS 002063 through 002113

29.   NLPD account and department numbers and descriptions-DS1447-1486

30.   1996 Season Product Code, Department Codes, Product Lines from GL CD

31.   1997 Season Product Codes and Product Lines from GL CD

32.   1998 Season Department Codes from GL CD

33.   NFLPD 2169 & 2170 (4Q '98 Direct Marketing Revenue Estimates)

34.   1996 NFL Properties Team Sales Analysis (through March) containing bates stamp
      number NFLP000036.

35.   1996 "Ranking Report" - Bates stamp number NFLPD 1483.

36.   (a) 1997 "Ranking Report" - Bates stamp number NFLPD 1482  and (b) '97 Ranking
      Report from Slottje file.

37.   (a) 1998 "Ranking Report" - Bates stamp number NFLPD 1481 and (b) '98 Ranking
      Report from Slottje file.

38.   VAX Sales Data Extraction for 1991 season containing bates stamp number DS001495.

39.   VAX Sales Data Extraction for 1992 season containing bates stamp number DS001496.

40.   VAX Sales Data Extraction for 1993 season containing bates stamp number DS001497.

41.   VAX Sales Data Extraction for 1994 season containing bates stamp number DS001498.

42.   VAX Sales Data Extraction for 1995 season containing bates stamp numbers DS001499.

24

43.    1990 Team Sales Analysis Report containing bates stamp number DS001500.

44.    1991 Team Sales Analysis Report containing bates stamp number DS001501.

45.    1992 Team Sales Analysis Report containing bates stamp number DS001502.

46.    1994 Team Sales Analysis Report containing bates stamp number DS001503.

47.    1995 Team Sales Analysis Report containing bates stamp number DS001504.

48.    1995 Ranking Report containing bates stamp numbers DS001505.

49.    1996 Team Sales Analysis containing bates stamp number DS001506.

50.    1997 Team Sales Analysis Report containing bates stamp number  DS001507.

51.    1998 Team Sales Analysis Report containing bates stamp number DS001508.

52.    (a) 1999 Ranking Report containing bates stamp numbers DS001509 and (b) '99 Ranking
       Report from Slottje file.

53.    (a) 2000 "Ranking Report containing bates stamp numbers DS001510  and (b) 2000
       Ranking Report from Slottje file.

54.    Reynolds binder with report and the following exhibits:
55.    Exhibit A
56.    Exhibit B-1
57.    Exhibit B-2
58.    Exhibit B-3
59.    Exhibit C
60.    Exhibit D
61.    Exhibit E
62.    Exhibit F
63.    Exhibit G
64.    Exhibit H-1
65.    Exhibit H-2
66.    Exhibit H-3
67.    Exhibit H-4
68.    Exhibit I-1
69.    Exhibit I-2
70.    Exhibit I-3
71.    Exhibit I-4
72.    Exhibit J-1
73.    Exhibit J-2
74.    Exhibit J-3

75.     Exhibit J-4
76.     Exhibit J-5
77.     Exhibit K
78.     Exhibit L
79.     Exhibit M
80.     Exhibit N
81.     Exhibit O
82.     Exhibit P
83.     Exhibit Q
84.     Exhibit R
85.     Exhibit S
86.     Exhibit T-1
87.     Exhibit T-2
88.     Exhibit T-3
89.     Exhibit U
90.     Exhibit V
91.     Exhibit W
92.     Exhibit X
93.     Exhibit Y
94.     Exhibit Z
95.     Exhibit AA
96.     Exhibit BB

97.     Agreement between BSC, LLC and Service America Corporation dated July 9, 1996 containing bates stamp numbers 3RAV:00058 through 00128.

98.     Concessions Management Agreement between BRLP and Fine Host Corporation dated August 15, 1997 containing bates stamp numbers 3RAV:00001 through 00057.

99.     Service America Corporation Rent Statements identified by bates stamp numbers 1RAV:000001 through 000041.

100.    Memorandum of Agreement Among Maryland Stadium Authority and Cleveland Browns, Inc. and BSC, LLC dated October 27, 1995 containing bates stamp numbers BR001057 through 001118.

101.    Amended and Restated Agreement By and Between Maryland Stadium Authority and Baltimore Ravens Limited Partnership dated August 15, 1997 containing bates stamp numbers BR001119 through 001176.

102.    License Agreement dated October 1, 1982 between Trustees and NFLP containing bates stamp numbers BR001177 and BR001189.

103.    Trust Agreement dated October 1, 1982 between owners of franchises in the National Football League and the Trustees containing bates stamp numbers NFLP007663 through

26

007693.

104. Standard form Retail Licensing Agreement containing bates stamp numbers NFLP000535 through 000544.

105. Bottom Line Images' Licensing Agreement Term Sheet, dated April 2, 1996

106. Bottom Line Images' General Retail Licensing Agreement dated August 25, 1994

107. Bottom Line Images' Licensing Agreement Term Sheet dated September 4, 1997

108. Bottom Line Images' Retail Licensing Agreement dated September 4, 1997

109. Bottom Line Images' Licensed Product Quality Control Approval Form submitted April 5, 1998

110. Bottom Line Images' Royalty Report for the period of 12/1/98-12/31/98

111. NFLP Royalty Database (LM) Report for year ended March 31, 1997 containing bates stamp numbers DS001511 through DS001676.

112. NFLP Royalty Database (LM) Report for year ended March 31, 1998 containing bates stamp numbers DS001677 through DS001869.

113. NFLP Royalty Database (LM) Report for year ended March 31, 1999 containing bates stamp numbers DS001870 through DS002062.

114. Printout from a CD disk containing the "Partial Ravens Database".

115. CD disk containing the "Partial Ravens Database".

116. Minimum Guarantee Shortfall schedules for the 1996 season containing bates stamp numbers DS001427 through DS001432.

117. Minimum Guarantee Shortfall schedules for the 1997 season containing bates stamp numbers DS001433 through DS001439.

118. Minimum Guarantee Shortfall schedules for the 1998 season containing bates stamp numbers DS001440 through DS001446.

119. Game Day Magazine, August 17, 1996 Issue

120. Insider Magazine, August 8, 1998 Issue

121. Insider Magazine, December 27, 1998 Issue

122.   Insider Magazine, September 19, 1999 Issue

123.   Slottje depositions Exhibits 26-71 (a- vv)

124.   Purple Sweatshirt (Russell)

125.   Street Sign (Fremont Die, Inc.)

126.   Metal Key Chain (Wincraft)

127.   Metal Key Chain (Great American Products)

128.   Key Chain (Tag Express) A & B

129.   Coffee Mug (Xpres)

130.   Coffee Mug

131.   Glass Drink Mug

132.   Insulated Water Bottle

133.   Laser Cut Auto Tag (Tag Express)

134.   Black Hat (Annco)

135.   Black Hat (Logo Athletic)

136.   Purple Hat - Gameday

137.   Black Hat with helmet on side (Logo 7)

138.   White & Purple Hat

139.   White stripped Hat - (Drew Pearson Co.)

140.   Trash Can

141.   Auto Tag (Wincraft)

142.   Auto Tag (Tag Express)

143.   Plastic Cup (Fine Host Corp)

144.   Football (Fotoball)

145.   Gloves -(Insulate & Wells Lamont) A & B

146.   Car Flag (Fremont)

147.   Tie (Ralph Marlin & Co.)

148.   Grey Cup with white lid (Betras Plastics)

149.   Helmet mug with insulated cup (Team Mug)

150.   Little Flag with helmet design (Emerson US)

151.   Baltimore Ravens License Plate - Plastic (Wincraft)

152.   Pin - shaped flying B (Peter David, Inc.)

153.   Pin - Pennant shaped (Wincraft, *Inc.)*

154.   Pin - Shield shaped (Peter David, Inc.)

155.   Pin - Helmet shaped (Peter David, Inc.)

156.   Pin - Airforce shaped (Peter David, Inc.)

157.   Pin - 1/4 circle shaped (Peter David, Inc.)

158.   Pin - Quarterback throwing football shaped (Peter David, Inc.

159.   Woven blanket (Northwest Company) [this has the new logo pasted over the old logo - we do not have the actual blanket.

160.   Seat Cushion (Wincraft)

161.   Inflatable Football helmet (Air Fantastic Inflatables)

162.   Shield Sign (Tag Express)

163.   Locker Room Sign (Wincraft)

164.   Patch (Lion Brothers & Co., Inc.)

165.   Miller Sign

166.   Bumper Sticker (Tag Express)

167.   Bumper Sticker (Wincraft)

168.   Static Cling Decal, Reusable (Tag Express)

169.   Static Cling Decal, Reusable (Tag Express)

170.   Pennant (Wincraft)

171.   Bath Scatter Rug (Jay Franco)

172.   Pillow (Cushion Craft)

173.   1 Parking Sign (Fremont Die, Inc.)

174.   Insulated Can holder (no markigs)

175.   Blanket 60" x 80" (Biederlack)

176.   Fleece Blanket 60" x 50" (Biederlack)

177.   Coffee Mug (Xpress Corp.)

178.   Coffee Mug (unmarked)

179.   Desktop Locker for CDs (Suncast Corp.)

180.   Bookmarker (on back says the Art of Sports)

181.   Tattoo (from paper)

182.   Lunch Bag (innovo, Inc.)

183.   Sweatshirt (Pro Player)

184.   Imitation Parking Sign

185.   Collectible Pick up truck (White Rose Collectibles)

186.   1996 Matchbox Tractor Trailer (White Rose Collectibles)

187.   Turtleneck (Antigue)

188.   Small pennant (Wincraft)

189.   Fleece Jacket (Pro Elite)

190.   Mini Helmet Lamp (Riddell)

191.   Model Train (Mantua Collectibles)

192.   NFL Note Pads & Pen Set (John F. Turner & Co.)

193.   Air Freshener (Penguin Products, Inc.)

194. Hat (Schuessler Mills)

195. Hooded Poncho (Rainmate) (Gameday)

196. Coffee Mug (Hunter Mfg.)

197. Plastic drinking cup with lid & straw (Bestras Plastics)

198. Baltimore Ravens Inaugural Season plastic cup

199. 1996 Inaugural Seasons Ravens (Berry Plastics)

200. Small Football - Wilson

201. Office Gift Set (Coaster, cup & mouse pad)

202. Jigsaw Puzzle - Buffalo Games, Inc.

203. Father's Day Cards (2) -Bernie Kosar Greeting Cards (Exhibits A & B)

204. Metal Lunch Box - Derivative Works, Inc.

205. Poster - Norman James Corp.

206. Baltimore Ravens metal license plate (Gameday)

207. Staring Line-up Classic Doubles figurines, Jim Harbaugh (Kenner/Hasbro)

208. Silly Slammer football (GGI)

209. Hat Baltimore Ravens (American Needle)(Khaki color)

210. Hat Floppy Ravens (American Needle)(Khaki color)

211. Balloon (Classic Balloon Corp.)

212. Inaugural Season Baltimore Ravens cup (Berry Plastics)

213. Baltimore Ravens plastic cup

214. Umbrella Can - P&K Products

215. Baby Onesy w/bib & booties - Play Football

216. Child's Sweatsuit - Play Football

217. T-shirt (Riddell)

218.   Bottle of Hot Sauce - Hot Sauce Harry's

219.   Throw Blanket - Northwest Co.

220.   Mike McCrary signed 8x11 Photo -

221.   Locker Room  - Wincraft

222.   Fleece Slippers - Footgear Inc. of Cambridge Footwear Group

223.   Lighter (Touch Lite)

224.   Dog Leash - Hunter

225.   Key Loop - Hunter

226.   Coasters - Xpress Corp

227.   Plastic Key Chain - Wincraft Sport

228.   Fleece Cap - Gameday

229.   Popcorn Can - P&K Products

230.   Wall Paper border - Village (FSC Wallcoverings)

231.   Beach towel - TerriSol Corp.

232.   Ravens Banner - Wincraft

233.   Body Care Pack (MGI USA, Inc.)

234.   Football - Wilson

235.   Window Clings - Color Clings

236.   Suction Window Decal - Color Clings

237.   Wall Decorations - Color Clings

238.   Checkers - Big League Promotion Corp.

239.   Purple hat with black rim (Twins Enterprise)

240.   Rubberized Bag

241.   Inaugural Seal 4-Photo in Plastic - French Bray, Inc.

242.   Bobbin-Heal Doll - Twin Enterprises

243.   Roll of Wrapping Paper (Hallmark)

244.   Baltimore Regional Maps (SportsMap-The Lawrence Group)

245.   2 Packs of Sticker World Sheets (American Greeting) A & B

246.   School 2-Pocket folders (Play Football & Plymouth Inc)A-O

247.   Package of Wrapping Paper (Hallmark)

248.   NFL Pen (Pentech)

249.   NFL Pencils (Pentech)

250.   Goal Post Pencils with Eraser (multiple)

251.   ½ Gallon Mug (7-11)

252.   Sports Talk Football, Sega Genesis

253.   NFL GameDay '97, PlayStation, Players, Inc./Sony

254.   Tecom Super Bowl, PlayStation, Players, Inc.

255.   Madden 99, for Windows, Players, Inc.

256.   Baltimore Ravens Team Set Title Card, 1998 Draft Pick (Edge Supreme)

257.   3 packs of cards, Transactions (Topps) A-C

258.   3 packs of Football Trading Cards from Dick's Sporting Goods (Upper Deck) A-C

259.   Book of football trading cards

260.   Little Football Helmet (Riddell)

261.   Suitcase (Duffle bag type)

262.   NFLP 0142, 0144, 0148, 0154, 0159, 0164, 0171, 0176, 0178, 0181, 0190, 0204, 0290, 0299, 0349

263.   NFLPD 0350, 0552, 0576, 0599, 0615, 0630, 0646, 0663, 0677, 0697

264.   NFLPD 0139, 0140, 0505, 0527, 0549, 0571, 0595, 0611, 0664, 0789, 0988

265.   NFLP 61-1335

266.   NFLP 2232, 2240, 2248, 2256, 2264

267.   Reynolds Report 4-26-02

268.   Reynolds report 5-23-02

269.   Reynolds Report 5-30-02

270.   Reynolds Amended Exhibits

271.   Reynolds Report 6-5-02

272.   Reynolds Report 4-5-02
273.   Spare
274.   Spare
275.   Spare
276.   Spare
277.   Spare
278.   Spare
279.   Spare
280.   Spare
281.   Spare
282.   Spare
283.   Spare
284.   Spare
285.   Spare
286.   Spare
287.   Spare
288.   Spare
289.   Spare
290.   Spare
291.   Spare
292.   Spare
293.   Spare
294.   Spare
295.   Spare
296.   Spare
297.   Spare
298.   Spare
299.   Spare
300.   Spare

Plaintiff's Known Rebuttal Documents

301.   Fax from David Modell to Bruce Burke identified with bates stamp numbers NFLP007697 through 007703.

302.   June 6, 1996 Morgan article

303.   NFLP 000547 - Q & A With Ravens Vice President David Modell

304.   Slottje Regression output DS 002944-2947

305.   Logo Change - Philadelphia Eagles

306.   Eagles Style Guide NFLPD 12518-12521

307.   Logo Change - New England Patriots

308.   Patriots Style Guide NFLPD 12526-12533

309.   Logo Change - Tampa Bay Buccaneers

310.   Buccaneers Style Guide NFLPD 12502-12505

311.   Logo Change - Denver Broncos

312.   Bronco Style Guide NFLPD 12538-12541

313.   Logo Change - Houston Oilers

314.   Helmet check list NFLP 7762

315.   Hamilton report, resume and exhibit (Exhibits A, B, & C)

316.   Rust Report

317.   Four Wind tee-shirts (a-f)

318.   Spare

319.   Spare

320.   Charter Bus Street sign

321.   2 pictures of sign at Raven's offices (Exhibits A & B)

322.   3 pictures of stadium signs (fall 1998) (Exhibits A, B, & C)

323. 4 pictures of Ravens Stores, PSI (1999)(Exhibits A to D)

324. Washington Times self-dispensing Box

325. 18 pictures of the Flags at Harbor Place (Exhibits A to R)

326. Street sign

327. Street signs (5)(Exhibits A to E)

328. Security worker at Stadium (yellow jacket)

329. Worker at Stadium

330. Ravens Radio WLIF 102 truck

331. MBNA Display (Exhibits A & B)

332. Recycling Bin at Stadium

333. (5) downtown street decals drawn on street surface (Exhibits A to E)

334. (2) Highway sign (Exhibits A & B)

335. Ravens Team Store

336. (5) PSINet field (Exhibits A to E)

337. Visa sign on Smartvision (2) (Exhibits A & B)

338. (3) Baltimore Ravens Owings Mill's sign (Exhibits A, B, & C)

339. Baltimore Ravens April 16, 1996 Presentation

340. Baltimore Ravens May 3, 1996 Presentation-Phase II

341. November 14, 1997 letter from David O. Modell to Iam Gomer

342. November 18, 1998 Memorandum from Don Brown to All NFLP Licensees

343. May 23, 1996 Memorandum from Donald L. Brown to All NFLP Licensees with attachments

344. September 16, 1996 Memorandum from Donald L. Brown to All NFLP Licensees

345. April 18, 1996 Memorandum from Michelle Bork to Burke, Kim, Osaki, Falk, Frustace, Petosinelli, Hampton, Brown

36

346.   March 28, 1996 Memorandum from Bruce Burke to NFLP East/West League

347.   Baltimore Ravens, Actual Size 6.375, Art work to be used untill June 7th

348.   Helmet with Baltimore Ravens, To be used till June 7, 1996 Version 14.8.96

349.   April 4, 1996 Memorandum from Jim Connelly to Roget Atkin, Don Brown, Bruce Bruke, Kevin Carter, Gene Goldberg, Mark Hotzman, Eric Petrosinelli, Susan Rothman

350.   May 28, 1996 Memorandum from Maria Gigante to Retail Licensing

351.   May 30, 1996 Letter from Eric A. Petrosinelli to Mr. Matt Mirchin of Champion Products, Inc.

352.   May 30, 1996 Letter from Eric A. Petrosinelli to Mr. Doug Reed of Nike, Inc.

353.   May 23, 1996 Memorandum from Eric Petrosinelli to Retail Licensing

354.   May 23, 1996 Memorandum from Donald L. Brown to All NFLP Licensees

355.   June 6, 1996 Memorandum from Suan Rothman to Donald Brown, Jim Connelly and Eric Petrosinelli

356.   May 31, 1996 Memorandum from Donald L. Brown to All NFLP Licensees

357.   August 19, 1997 Fax with attachments from La Mott Britto of the Starter Corporation to Don Brown, Dana Johnson, Eric Petrosinelli

358.   November 18, 1997 Memorandum from Don Brown to All NFLP Licenses

359.   November 19, 1997 Letter from Donald L. Brown to Mr. David Modell

360.   Book entitled, Total Football II, The Official Encyclopedia of the National Football League (HarperCollins, Publishers)

361.   Excerpts from Book entitled, Total Football II, The Official Encyclopedia of the National Football League (HarperCollins, Publishers), pgs. v, vi, 43-44, 68, 72-75, 77-79, 84-86, 96-98. (A-g)

362.   January 2, 2001 letter from David M. Proper to David Young re: mikebrownsucks.

363.   Printout from web site of mikebrownsucks

364.   January 4, 2001 letter from Dave Young to David M. Proper

365.   Complaint with exhibits filed in the matter of National Football League Properties, Inc. v. East Coast Sportswear, Inc. d/b/sa "East Coast Sportswear & More", et al., United States

District Court for the District of Maryland, Case No.: S01 CV 0165.

366. Complaint with exhibits filed November 21, 2000 in the matter of New York Football Giants, Inc., and National Football League Properties, Inc. v. Tracy Penn and Kerry Penn d/b/a Giant NJ Sutff, All Internet Guide, Inc. and A-Break Cook Stuff Co., United States District Court for the District of New Jersey, Civil No.: 00-5756 (MLC).

367. Baltimore Ravens Mission card

368. 1996 Baltimore Ravens, Our Inaugural Season Identification Card

369. 1997 Baltimore Ravens Last Season at Memorial Stadium Identification Card

370. 1998 Baltimore Ravens Schedule

371. Business card of Baltimore Ravens for Bernie Stawski, Sales Associate

372. Brochure: A New Way to Party on Game Day! - 1998 Baltimore Ravens Game Day Party Facilities.

373. Baltimore Ravens Personalized Seating Diagram

374. Envelope from Baltimore Ravens, with a letter dated June 22, 1998 enclosing a brochure, What's Your Game Plan? and Recommended Downtown Parking Facilities for Ravens PSL Owners

375. July 8, 1997 Jim Bailey Letter to WCBM Radio (NFLP00659-60)

376. Baltimore Ravens 1996 A Fan's Guide to Memorial Stadium, Our Inaugural Season brochure

377. Major League Vacations - Official Baltimore Ravens Road-Trips, Volume VI, Issue 1, Fall -97 (brochure)

378. Extra Order Application (PSL/Tickets)

379. Enjoy Your Home Field Advantage (Magazine)

380. Baltimore Ravens seating chart indicating pricing of seats

381. Permanent Seat License Application (brochure)

382. Ravens' Report, Volume 3

383. Ravens' Report, Volume 4

384. Baltimore Ravens Football at Camden Yards (newspaper on new Stadium)

385. Letter dated 7/22/96 to Season Ticket Holder from Ravens' organization members

386. Letter dated 7/10/98 to PSL Holder from Baltimore Ravens' Director, Ticket Operations

387. 1999 Baltimore Ravens Schedule

388. 1997 MTA Park-And-Ride Bus Service to Baltimore Ravens Football at Memorial Stadium brochure

389. Baltimore Ravens Fan Guide, Official Guide to the Ravens 2000 Home Season

390. 2000 Baltimore Ravens Identification Card

391. Brochure: Quarterback Club of Baltimore

392. 2000 Baltimore Ravens PSL Owner Mail Order Form, You're First in Line for Extra Tickets

393. 1996 Baltimore Ravens Our Inaugural Season Identification Card

394. 1998 Baltimore Ravens Inaugural Season at Camden Yard Identification Card

395. Happy Holiday card from the Baltimore Ravens

396. 1998 brochure: Ravens at Camden Yards

397. Brochure: Fan Guide, PSINet Stadium, Home of the Baltimore Ravens.

398. July 30, 1998 tickets (2) to PSL Owners Open House & Team Practice

399. 1999 Baltimore Ravens Identification cards

400. Season's Greetings card from the Baltimore Ravens

401. Brochure: Ravens Season Transit Passes from the MTA (1999)

402. Brochure: Score Big?, Earn Ravens Merchandise - Refer A Friend

403. 1996 Holiday Card from the Baltimore Ravens

404. Ravens 12th Man Playbook, a Guide to Your New Stadium

405. Expert Opinion of Craig A. Ziegler dated 12/5/97

406. Photo: Inaugural Season, Compliment of French Bray, Inc.

407. Sun Article, 10/16/96, 1998 Season Ticket Booklets for the New Ravens' Stadium at

39

Camden Yards Begin Arriving This Week

408.  Ticket for Game 7, December 1, 1996

409.  Ticket for November 16, 1997

410.  Ticket for Game P2, August 17, 1996

411.  Ticket for Game 2, September 29, 1996

412.  Ticket for Game 3, October 6, 1996

413.  Ticket for Game P1, August 3, 1996

414.  Ticket for Countdown 8, August 31, 1997

415.  Ticket for Countdown 5, October 19, 1997

416.  Ticket for August 24, 1998

417.  Ticket for December 27, 1998

418.  Ticket for December 5, 1999

419.  Pink Ticket: Fund Raiser University of Maryland

420.  Ticket: Final Game, December 14, 1997

421.  Green Access Ticket, Game 2, August 17, 1996

422.  Baltimore Ravens Football Company, Inc. and Subsidiary and Baltimore Stadium
Company, LLC - Audited combined financial statements as of January 31, 1997,
together with Report of Independent Public Accountants, containing bates stamp numbers
4RAV:000001 through 000022.

423.  Baltimore Stadium Limited Partnership, Baltimore Ravens Football Company, Inc.,
Baltimore Ravens, Inc. and Baltimore Stadium Company, LLC - Audited combined
financial statements as of January 31, 1999 and 1998, together with Report of
Independent Public Accountants, containing bates stamp numbers 4RAV:000023 through
000041.

424.  Baltimore Ravens Limited Partnership, Baltimore Ravens Inc., and Baltimore Stadium
Company, LLC - Audited combined financial statements as of January 31, 2000 and
1999, together with Report of Independent Public Accountants, containing bates stamp
numbers 4RAV:000042 through 000061.

425.  Report of Independent Public Accountants to the Board of Directors of Baltimore Ravens

Football Company, Inc. (1997) on "As Conformed" financial statements for the year ended January 31, 1997 containing bates stamp numbers 4RAV:000062 through 000074.

426.  Report of Independent Public Accountants to the Board of Directors of Baltimore Ravens, Inc. (1998) on "As Conformed" financial statements for the year ended January 31, 1998 containing bates stamp numbers 4RAV:000075 through 000087.

427.  Report of Independent Public Accountants to the Board of Directors of Baltimore Ravens, Inc. (1999) on "As Conformed" financial statements for the year ended January 31, 1999 containing bates stamp numbers 4RAV:000088 through 000103.

428.  Report of Independent Public Accountants to the Board of Directors of Baltimore Ravens, Inc. (2000) on "As Conformed" financial statements for the years ended January 31, 2000 containing bates stamp numbers 4RAV:000104 through 000118.

429.  Baltimore Stadium Limited Partnership - Federal income tax returns for the period August 16, 1997 to January 31, 1998 containing bates stamp numbers 4RAV:000176 through 000205.

430.  Baltimore Stadium Limited Partnership - Federal income tax returns for the fiscal year ended January 31, 1999 containing bates stamp numbers 4RAV:000255 through 000279.

431.  Baltimore Stadium Limited Partnership - Federal income tax returns for the fiscal year ended January 31, 2000 containing bates stamp numbers 4RAV:000312 through 000340.

432.  Baltimore Stadium Company, LLC – Partnership federal income tax returns for the year ended December 31, 1997 containing bates stamp numbers 4RAV:000206 through 000224.

433.  Baltimore Stadium Company, LLC – Partnership federal income tax returns for the year ended December 31, 1998 containing bates stamp numbers 4RAV:000296 through 000311.

434.  Baltimore Stadium Company, LLC – Partnership federal income tax returns for the year ended December 31, 1999 containing bates stamp numbers 4RAV:000360 through 000374.

435.  Baltimore Ravens Football Company and Subsidiary - Corporate federal income tax returns for the fiscal year ended January 31, 1997 containing bates stamp numbers 4RAV:000119 through 000175.

SUN Articles:

436.  Spare

41

437.  Employees Bid team tearful farewell - 03/30/84

438.  Loyalty is nothing, money all - 03/30/84

439.  Colts chronology - 03/30/84

440.  City starts legal action on Colts - 03/30/84

441.  Hey Indy, Baltimore's loss is no gain - 03/30/84

442.  12 years of Irsay denials - 03/30/84

443.  Irsay's 'friend,' the mayor, is still on hold - 03/30/84

444.  Bank, too, strikes quickly–to attach team's assets - 03/30/84

445.  Eminent domain bill signed; city may sue - 03/30/84

446.  Spare

447.  Cartoon: The Greatest Game Ever Played 1958/The Dirtiest Trick Ever Played 1984 - (1984)

448.  Legendary Colts reshaped city, NFL - 03/30/84

449.  Employees Bid team tearful farewell - 03/30/84

450.  Spare

451.  Spare

452.  Spare

453.  Spare

454.  Spare

455.  Spare

456.  Spare

457.  Eminent domain bill signed; city may sue - 03/30/84

458.  Colts Theft - 03/30/84

459.  Spare

460.  City judge bars Colts transfer in broad order - 03/31/84

461.   After the Colts Have Bolted - 03/31/84

462.   Furtive exit was final Colt insult - 04/01/844

463.   Life Without Irsay - 04/01/84

464.   Md.'s offer to Irsay revealed as most lucrative - 04/01/84

465.   Irsay says city's threats led to move - 04/03/84

466.   Hoosier adulation flows into Irsay cup - 04/03/84

467.   City settles for tie with Colts, hopes for win in future -   03/18/86

468.   City settles with Colts on '84 departure - 03/18/86

469.   A moveable past - 03/23/86

470.   Baltimore makes a trade, gets training camp in end of legal battle over Colts - 03/23/86

471.   Council OKs city's purchase of Colts' Owings Mill camp - 03/25/86472.

472.   Baltimore's Colts are gone - 03/30/86

473.   A part of Colts' past returns to city from Indianapolis - 04/04/86

474.   Colt Memories - 05/01/86

475.   Baltimore Colts gone but never forgotten - 05/01/86

476.   The team had a glorious history—until the "Irsay era" - (date unknown)

477.   The Irsay years: a moving experience - (date unknown)

478.   Hey, NFL: Let's hear it for a home team - 01/26/92

479.   With wooing over, all Schaefer can do is wait with fingers crossed - 10/26/93

480.   Schaefer displays perfect pitch in speech to NFL - 10/27/93

481.   It's time to play game of revenge - 12/01/93

482.   In museum of gall, Tagliabue's expansion remark is masterpiece - 12/05/93

483.   Maryland can just say 'no' to Cooke, Redskins - 12/12/93

484.   If players recall Simms, they're not likely to vote for new cap in '99 - 07/31/94

43

485.   Don't Give Up on Getting the Ball - 01/20/95

486.   No saint, Jones looks good next to Tagliabue's NFL - 09/22/95

487.   Just desserts for ll years of emptiness - 11/04/95

488.   On a sweet day, still a sour taste - 11/06/95

489.   You can say Cleveland's loss is Baltimore's gain, isn't it? 11/6/95

490.   Revenge lacks sweetness, brings whiff of hypocrisy - 11/07/95

491.   Jilted by first love Colts, some wary of new suitor - 11/09/95

492.   Readers opinions on the Browns Move - 11/19/95

493.   NBC shows Tagliabue reversing field on Baltimore's NFL team - 12/11/95

494.   Schaefer uses poison pen to haunt, taunt Tagliabue - 12/22/95

495.   Football tradition fades into a play-action fake - 01/16/96

496.   Cleveland fans due for more rejection - 01/21/96

497.   Late start curbs Modell hopes for '96 - 02/11/96

498.   A smart Art would follow Angelos' lead - 02/11/96

499.   Bidwill may spoil Cleveland celebration - 02/11/96

500.   Playing political football with NFL teams - 02/22/96

501.   Owners put more zip in site names - 05/06/96

502.   As heat rises, 54,000 can't wait for fall - 07/17/96

503.   A day for passing the torch in football's circle of life - 09/02/96

504.   No contest: payback lst, Steelers 2nd - 09/08/96

505.   Irsay's legacy: blackmail, bullying that taint sports - 01/16/97

506.   Cheers seen scarce for Tagliabue's visit But fans are urged to put rancor behind-09/05/98

507.   In this museum, a history lesson for Tagliabue - 09/06/98

508.   A kickoff to celebrate, then a game to forget  - 09/07/98

509.    A state-of-the-art debut–except on football field - 09/07/98

510.    Leave envy on sideline, Baltimore, we won... - 09/23/99

511.    For Fans, what a long, strained trip it's been - 12/11/00

512.    NFL erred in thinking Baltimore nevermore - 01/11/01

513.    (a) Sports Illustrated, December 4, 1995 Issue, Battle for the Brown Art Modell sucker-punched Cleveland, but the city is fighting back; (b) Article-December 4, 1995 Sports Illustrated Article "The Heart of a City", and (c) December 4, 1995 Sports Illustrated Cover and Article "End of an Epic"

514.    Baltimore Magazine, January 1996 Issue

515.    Sports Illustrated, September 1, 1997 Issue

Plaintiff reserves the right to utilize in his case in chief or in rebuttal any of the documents listed by the Defendants in their document list.

Defendants' Documents

Defendants' documents, except for rebuttal and impeachment, are as follows:

1.    NFLP Consolidated Financial Statement as of 3/31/99 and 1998 (NFLPD1411 – NFLPD1434) (confidential)

2.    NFLP Consolidated Financial Statement as of 3/31/98 and 1997 (NFLPD 1435 – NFLPD 1458) (confidential)

3.    NFLP Consolidated Financial Statement as of 3/31/97 and 1996 (NFLPD 1459 – NFLPD 1480) (confidential)

4.    Letters from NFLP to NFLP Business Partners (redacted) (NFLPD1484 – NFLPD1487) (confidential)

5.    NFLP Form Promotional Rights Agreement (redacted except as to premiums) (NFLPD1488 – 1492) (confidential)

6.    Section of NFLP 1998 Profit & Loss by Department concerning publishing (NFLPD2155) (confidential)

7.    Portion of NFLP 1998 general ledger concerning direct marketing (NFLPD2156) (confidential)

8.    Term sheet of Sports Illustrated promotional rights agreement (NFLPD2159 – NFLPD2160)  (confidential)

9.    NFLP consumer products department portion of general ledgers for fiscal years 1996, 1997 and 1998  (confidential)

10.   Baltimore Ravens logo slicks (NFLPD8252 – NFLPD8267)  (confidential)

11.   Service America Corporation Rent Statements to Baltimore Ravens (1RAV00001 – 1RAV00017)  (confidential)

12.   Fine Host Corporation Rent Statements to Baltimore Ravens (1RAV00018 – 1RAV00041)  (confidential)

13.   Baltimore Ravens Gameday Programs and NFL Insider Magazines

14.   Concessions Management Agreement between Baltimore Ravens and Fine Host Corp. (3RAV00001 – 3RAV00057)  (confidential)

15.   Services Agreement between Service America Corporation and Baltimore Stadium Company, LLC (3RAV00058 – 3RAV00128)  (confidential)

16.   Baltimore Ravens Combined Financial Statements (4RAV00001 – 4RAV000118) (confidential)

17.   Baltimore Ravens Chart of Accounts (6RAV00001 – 6RAV00022)  (confidential)

18.   Excerpts from Baltimore Ravens general ledgers for 1996, 1997 and 1998 Fiscal Years (confidential)

19.   NFLP License Agreement dated 10/1/82 (BR001177 – BR001189)  (confidential)

20.   NFL Trust Agreement dated 10/1/82 (NFLP007663 – NFLP007693)  (confidential)

21.   NFLP form retail license agreement (NFLP000535 – NFLP000544)  (confidential)

22.   Fine Host Corporation Post Event Stand Sheets (DS000001 – DS000651)  (confidential)

23.   Fine Host Corporation Purchase Orders (DS000652 – DS000739)  (confidential)

24.   NFLP Trial Balance – 1996 (DS000740 – DS001062)  (confidential)

25.   NFLP Trial Balance – 1997 (DS001063 – DS001279)  (confidential)

26.   NFLP Trial Balance – 1998 (DS001280 – DS001343)  (confidential)

27.   NFLP Profit & Loss by Department – 1997 (DS001344 – DS001362)  (confidential)

28.    NFLP Profit & Loss by Department – 1998 (DS001363 – DS001379)  (confidential)

29.    Houston Texans identity project documents (DS001400 – DS001418)  (confidential)

30.    Super Bowl XXXV logo project documents (DS001420 – DS001425)  (confidential)

31.    Tennessee Titans identity project documents (DS002985 – DS002986)  (confidential)

32.    NFL Royalty Rate Structure (DS001426)  (confidential)

33.    NFLP Minimum Guarantee Shortfalls (1996 – 1998)  (DS001427 – DS001446)
       (confidential)

34.    NFLP Charts of Accounts (DS001447 – DS001486)  (confidential)

35.    NFLP quality control documents  (confidential)

36.    NFLP retail sales reports and associated documents  (confidential)

37.    NFLP VAX Data Extraction – 1991 (DS001495)  (confidential)

38.    NFLP VAX Data Extraction – 1992 (DS001496)  (confidential)

39.    NFLP VAX Data Extraction – 1993 (DS001497)  (confidential)

40.    NFLP VAX Data Extraction – 1994 (DS001498)  (confidential)

41.    NFLP VAX Data Extraction – 1995 (DS001499)  (confidential)

42.    NFLP Ranking Report – 1996 (NFLPD1483)  (confidential)

43.    NFLP Ranking Report – 1997 (NFLPD1482)  (confidential)

44.    NFLP Ranking Report – 1998 (NFLPD1481)  (confidential)

45.    NFLP Ranking Report – 1999 (DS001509)  (confidential)

46.    NFLP Ranking Report – 2000 (DS001510)  (confidential)

47.    1996 NFL Properties Team Sales Analysis (through March)   (NFLP000036)
       (confidential)

48.    NFLP Retail License Projections/Sales – 1996 (DS001511 – DS001676)  (confidential)

49.    NFLP Retail License Projections/Sales – 1997 (DS001677 – DS001869)  (confidential)

50.    NFLP Retail License Projections/Sales – 1998 (DS001870 – DS002062)  (confidential)

51.   Article from Forbes Magazine – NFL Team Values 1999 – 2001 (DS002117 – DS002139)

52.   Article from Financial World – NFL Team Values 1991 – 1997 (DS002140 – DS002176)

53.   U.S. Census Bureau data – Population Estimates Program, Population Division (www.census.gov)  (DS002177 – 002261)

54.   U.S. Department of Commerce, Bureau of Economics Analysis data (www.bea.doc.gov) (DS002262 – 002273)

55.   Bureau of Labor Statistics data (www.bls.gov)  (DS002274 – DS002295)

56.   Baltimore Ravens Trial Balance – 1996 (DS002296 – DS002307)  (confidential)

57.   Baltimore Ravens Trial Balance – 1997 (DS002309 – DS002320)  (confidential)

58.   Baltimore Ravens Trial Balance – 1998 (DS002322 – DS002333)  (confidential)

59.   NFL team statistics – Internet printouts (DS002334 – DS002505)

60.   Internet printouts from www.superbowlhistory.com (DS002705 – DS002709)

61.   Article from Financial World (DS002715 – DS002730)

62.   NFL attendance data (DS002744 – DS002745)  (confidential)

63.   Data concerning econometric model (DS002944 – DS002954)  (confidential)

64.   Baltimore Ravens cost of publishing invoices and proofs of payment (DS002989 – DS003064)  (confidential)

65.   Total Football II (ed. Carroll et al.) (NY:  Harper Collins – 1999)

66.   NFL team media guides

67.   Article from the Denver Post (DS002773 – DS002776)

68.   Article from the Florida Times Union (DS002780)

69.   Article from the San Antonio Express News (DS002783 – DS002785)

70.   Article from the Dayton Daily News (DS002797 – DS002798)

71.   Article from the Atlanta Journal and Constitution (DS002803 – DS002804)

72.   Article from the St. Louis Post-Dispatch (DS002814 – DS002815)

48

73.     Article from AP Online (DS002819 – DS002820)

74.     Baltimore Ravens portion of licensee management royalty database for 1996 – 1998 (confidential)

75.     Baltimore Ravens trademark registrations

76.     Service America Corporation – Baltimore Ravens Football – 1996 Actual Edit

77.     Service America Corporation – Baltimore Ravens Football – 1997 Actual Edit

78.     Fine Host 1998 Items Sold/Sales Mix (FH00001 – FH00003)  (confidential)

79.     Data Development Corporation Surveys (WIND000423 – WIND0011299)  (confidential)

80.     Market Results (WIND11398 – WIND11402)  (confidential)

81.     Questionnaire concerning knowledge of legal proceedings (WIND11403 – WIND11419) (confidential)

82.     Chart concerning Validation Report (WIND11420 – WIND11421)  (confidential)

83.     Chart concerning results from T-Shirt Study 41-520B (WIND11422 – WIND11424) (confidential)

84.     Field Authorization Form (WIND11425 – WIND11426)  (confidential)

85.     Validation Report Information (WIND11427 – WIND11428)  (confidential)

86.     Charts re Information from T-Shirt Study 41-520 (WIND11429 – WIND11432) (confidential)

87.     Field Authorization Form (WIND11433 – WIND11434)  (confidential)

88.     Memo concerning cost estimates prepared for various designs in T-Shirt Study (WIND11435 – WIND11437)  (confidential)

89.     Value of Shield Logo Design Final Verbatim Books 1 and 2 (WIND11438 – WIND12452)  (confidential)

90.     T-Shirt study forms and questionnaires (WIND12453 – WIND12562)  (confidential)

91.     Validation Forms (WIND12563 –WIND12804)  (confidential)

92.     Pictures of various Baltimore Ravens logos (WIND12805 – WIND12808)

93.     NFLP licensed video games

94.    NFLP licensed trading cards

95.    Baltimore Ravens 32 oz. soda cup

96.    Expert report of Dr. Daniel J. Slottje dated November 29, 2001  (confidential)

97.    Exhibit 1 of expert report of Dr. Daniel J. Slottje dated November 29, 2001 – academic C.V.

98.    Exhibit 2 of expert report of Dr. Daniel J. Slottje dated November 29, 2001 – professional resume

99.    Exhibit 3 of expert report of Dr. Daniel J. Slottje dated November 29, 2001 – documents reviewed and/or relied upon  (confidential)

100.    Exhibit 4 of expert report of Dr. Daniel J. Slottje dated November 29, 2001 – revenue calculations  (confidential)

101.    Exhibit 5 of expert report of Dr. Daniel J. Slottje dated November 29, 2001 – expense analysis  (confidential)

102.    Exhibit 6 of expert report of Dr. Daniel J. Slottje dated November 29, 2001 – photos of Ravens jerseys  (confidential)

103.    Expert report of Dr. Daniel J. Slottje dated May 6, 2002  (confidential)

104.    Exhibit 1 to expert report of Dr. Daniel J. Slottje dated May 6, 2002 – revenue calculation (confidential)

105.    Exhibit 2 to expert report of Dr. Daniel J. Slottje dated May 6, 2002 – revenue calculation (confidential)

106.    Exhibit 3 to expert report of Dr. Daniel J. Slottje dated May 6, 2002 – revenue calculation (confidential)

107.    Exhibit 4 to expert report of Dr. Daniel J. Slottje dated May 6, 2002 – gross profit from program sales  (confidential)

108.    Exhibit 5 to expert report of Dr. Daniel J. Slottje dated May 6, 2002 – 1996 revenues related to program sales  (confidential)'

109.    Exhibit 6 to expert report of Dr. Daniel J. Slottje dated May 6, 2002 – 1997 revenues related to program sales  (confidential)

110.    Exhibit 7 to expert report of Dr. Daniel J. Slottje dated May 6, 2002 – 1998 revenues related to program sales  (confidential)

111.   Exhibit 8 to expert report of Dr. Daniel J. Slottje dated May 6, 2002 – 1996 expenses related to cost of publication  (confidential)

112.   Exhibit 9 to expert report of Dr. Daniel J. Slottje dated May 6, 2002 – 1997 expenses related to cost of publication  (confidential)

113.   Exhibit 10 to expert report of Dr. Daniel J. Slottje dated May 6, 2002 – 1998 expenses related to cost of publication  (confidential)

114.   Exhibit 11 to expert report of Dr. Daniel J. Slottje dated May 6, 2002 – soft drink sales analysis  (confidential)

115.   Expert report of Dr. Yoram Wind dated November 29, 2001  (confidential)

116.   Exhibit A to expert report of Dr. Yoram Wind dated November 29, 2001 – photos of stimuli  (confidential)

117.   Exhibit B to expert report of Dr. Yoram Wind dated November 29, 2001 – screening questionnaire  (confidential)

118.   Exhibit C to expert report of Dr. Yoram Wind dated November 29, 2001 – main questionnaire  (confidential)

119.   Exhibit D to expert report of Dr. Yoram Wind dated November 29, 2001 – pre-test questionnaire  (confidential)

120.   Exhibit E to expert report of Dr. Yoram Wind dated November 29, 2001 – pre-test results  (confidential)

121.   Exhibit F to expert report of Dr. Yoram Wind dated November 29, 2001 – field instructions  (confidential)

122.   Exhibit G to expert report of Dr. Yoram Wind dated November 29, 2001 – verification questionnaire  (confidential)

123.   Exhibit H to expert report of Dr. Yoram Wind dated November 29, 2001 – statistical tests  (confidential)

124.   Exhibit I to expert report of Dr. Yoram Wind dated November 29, 2001 – resume of Dr. Wind  (confidential)

125.   Expert report of Dr. Yoram Wind dated May 6, 2002  (confidential)

126.   Table 1 to expert report of Dr. Yoram Wind dated May 6, 2002 – sampling approaches used in various studies  (confidential)

If necessary, Defendants will present the following rebuttal documents:

127.   Mock turtle neck (Majestic Athletic)

128.   Embroidered bath set – bath and hand towels (First Row)

129.   Duffle/gym bag (Play Football)

130.   Door mat (Ideal Rubber Products, Inc.)

131.   Sweatshirt (Riddell)

132.   Team collectible trucks (White Rose Collectibles)

133.   Billiard ball (Imperial International, div. of H. Betti Industries)

134.   Cap (Nike)

135.   Cap (Logo Athletic)

136.   Caps (Sports Specialties)

137.   Cap

138.   Football (Fotoball)

139.   Lighter (Zippo Manufacturing)

140.   "Bad Call Brick" (Hallmark)

141.   Pins (Imprinted Products Corp.)

142.   Coffee mug

143.   Sunglasses

144.   License plate (Dixie Seal)

145.   Pencil

146.   Tin container (Giftco, Inc.)

147.   Necktie (Ralph Marlin & Co.)

148.   Fishing lure (Oxboro Outdoors)

149.    Fleece blanket (Biederlack of America)

150.    Beach towel

151.    Gloves (Wells Lamont)

152.    Post-it note pad (Hunter)

153.    Sticker (WinCraft Sports)

154.    Temporary tatoos (Play Sports Marketing, Inc.)

155.    Key chain (Hunter)

156.    Beanbag ball (Good Stuff Corporation)

157.    Barbecue sauce (Hot Sauce Harry's)

158.    Exhibit Nos. 124 through 259 of Plaintiff's Exhibits Designations dated May 17, 2002

159.    Additional merchandise

160.    Advertisements from newspapers

161.    Advertisements from catalogs

        Defendants also reserve the right to use any documents listed by Plaintiff in Defendants'

case-in-chief or in rebuttal.


X.    **Fact Witnesses**

        Plaintiff's witnesses in chief are:

        Luis Perez, Baltimore Ravens, Inc.,1101 Russell Street, Baltimore, MD 21230, 410-547-8100

        David Proper, National Football League Properties, Inc., 280 Park Avenue, New York, NY 10017

        Mark W. Reynolds, CPA, Gross, Mendelsohn & Associates, P.A., 36 S. Charles Street, Baltimore, MD 21201, 410-685-5512

If needed, Plaintiff will also call the following:

Erwin A. Burtnick, One Ivory Crest Court, Baltimore, MD 21209, 410-653-5577

John E. Burns, Citation Investigation Agency, 5005 Wards Chapel Road, Owings
Mills, MD 21117, 410-655-7463

Plaintiff's known rebuttal witnesses are

David Modell, Baltimore Ravens, Inc., 1101 Russell Street, Baltimore, MD 21230, 410-
547-8100

John Moag, Moag & Company, 1010 Hull Street, Suite 201, Baltimore, MD 21230, 410-
230-0105

Luis Perez, Baltimore Ravens, Inc.,1101 Russell Street, Baltimore, MD 21230, 410-547-
8100

David Proper, National Football League Properties, Inc., 280 Park Avenue, New York,
NY 10017

Mark W. Reynolds, CPA, Gross, Mendelsohn & Associates, P.A., 36 S. Charles
Street, Baltimore, MD 21201, 410-685-551

Bruce W. Hamilton, Ph.D., Department of Economics, Johns Hopkins University,
3400 N. Charles Street, Baltimore, MD 21218, 410-516-7613

Dr. Roland T. Rust, David Bruce Smith Chair in Marketing, Director, Center for
E-Service, Chair, Department of Marketing, Robert H. Smith School of Business,
University of Maryland, College Park, MD 20742, 301-405-4300

Jon Morgan, c/o The Baltimore *Sun*, 501 N. Calvert Street, Baltimore, MD 21202,
410-332-6200

Michael Olesker, c/o The Baltimore *Sun*, 501 N. Calvert Street, Baltimore, MD
21202, 410-332-6107

Plaintiff reserves the right to call in his case in chief or in rebuttal any of the witnesses

listed by the Defendants in their witness list.

Defendants' Witnesses

Defendants expect to present the following witnesses at trial:

1.  Douglas O'Connell (National Football League Properties, Inc., 280 Park Avenue, New York, New York 10017, (212) 450-2000)

2.  Gene Goldberg (National Football League Properties, Inc., 280 Park Avenue, New York, New York 10017, (212) 450-2000)

3.  Jim Connelly (NFL Europe, 1st Floor,  97-99 Kings Road, London, SW34PA England (011-44-207-225-3070))

4.  Paula Guibault (National Football League Properties, Inc., 280 Park Avenue, New York, New York 10017, (212) 450-2000)

5.  Susan Rothman (National Football League Properties, Inc., 280 Park Avenue, New York, New York 10017, (212) 450-2000)

6.  Thomas Riden (VF Imagewear, Inc., 4408 West Linebaugh Avenue, P.O. Box 22061, Tampa, Florida (336) 960-6781)

7.  Tom Shine (Group Athletica, 8677 Logo 7 Court, Indianapolis, Indiana 46219 (317) 895-7778)

8.  Peter McCabe (Biederlack Co., 11501 Bedford Road NE, Cumberland, Maryland 21502 (301) 759-3633)

9.  Joel Linzner (Electronic Arts, 209 Redwood Shores Parkway, Redwood City, California 94065 (650) 628-1500)

10. Lloyd Pawlak (Fleer, Executive Plaza, 3rd Floor, 1120 Route 73, Mt. Laurel, New Jersey 08054 (856) 231-6200)

11. Matthew Mirchin (Russell Corporation, 3330 Cumberland Boulevard, Suite 700, Atlanta, Georgia 30339 (678) 742-8000)

12. Bob O'Keefe (National Football League Properties, Inc., 280 Park Avenue, New York, New York 10017, (212) 450-2000)

13. Luis Perez (Baltimore Ravens, Inc., Ravens Stadium, 1101 Russell Street, Baltimore, Maryland 21230, (410) 547-8100)

14. Jim Coller (Baltimore Ravens, Inc., Ravens Stadium, 1101 Russell Street, Baltimore, Maryland 21230, (410) 547-8100)

15.    Michael Dubey (Fine Host Corporation, Ravens Stadium, 1101 Russell Street, Baltimore, Maryland 21230, (410) 230-8080)

16.    Sandy Murrey (Fine Host Corporation, Ravens Stadium, 1101 Russell Street, Baltimore, Maryland 21230, (410) 230-8080)

17.    Wayne Adams ((Fine Host Corporation, Ravens Stadium, 1101 Russell Street, Baltimore, Maryland 21230, (410) 230-8080)

18.    Richard Kahn (Volume Services America, 201 East Broad Street, Spartanburg, SC 29306, (864) 598-8657)


If necessary, Defendants may call the following witnesses:

19.    John E. Burns (One Ivory Crest Court, Baltimore, Maryland 21209 (410) 653-5577)

20.    Erwin A. Burtnick (Citation Investigation Agency, 5005 Wards Chapel Road, Owings Mills, Maryland 21117, (410) 655-7463)


Defendants also reserve the right to call additional witnesses for impeachment purposes, as well as any witnesses listed by Plaintiff or the Plaintiff himself, in Defendants' case-in-chief or in rebuttal.


## XI.    **Expert Witnesses**

Plaintiff's experts will be:

Mark W. Reynolds, CPA, Gross, Mendelsohn & Associates, P.A., 36 S. Charles Street, Baltimore, MD 21201, 410-685-5512

Bruce W. Hamilton, Ph.D., Department of Economics, Johns Hopkins University, 3400 N. Charles Street, Baltimore, MD 21218, 410-516-7613

Dr. Roland T. Rust, David Bruce Smith Chair in Marketing, Director, Center for E-Service, Chair, Department of Marketing, Robert H. Smith School of Business, University of Maryland, College Park, MD 20742, 301-405-4300

Defendants' Expert Witnesses

Defendants' expert witnesses will be:

1.  Dr. Daniel J. Slottje (KPMG, 200 Crescent Court, Suite 300, Dallas, Texas 75201, (214) 840-2000)

2.  Dr. Yoram Wind (The Wharton School, University of Pennsylvania, 1467 Steinberg Hall-Dietrich Hall, Philadelphia, Pennsylvania 19104, (215) 898-8267)

## XII.   **Depositions & Trial Testimony**

Plaintiff intends to read portions of the following depositions:

Anita Singer (4/16/02), P5, L7 - P6, L24; P7, L14 - P35, L8; P35, L19 - P39, L18.

Douglas O'Connell (3/25/02), P14, L15-24; P18, L13 - P19, L5; P22, L7 - P49, L25; P54, L5 - L9; P55, L2-14; P56, L20 - P 57, L12; P63, L25 - P64, L14; P79, L14 - L21; P81, L10 - P82, L12; P83, L16 - P84, L22; P 86, L11 - P87, L23; P89, L3 - P90, L20; P97, L5 - P98, L5; P99, L16 -P102, L13; P108, L18 -P111, L8; P112, L2 - L24; P116, L8 - P121, L22; P122, L5 - P124, L14; P137, L4 - L11; P140, L18 - P143, L3; P148, L9 - P150, L20; P151, L24 - P153, L7; P153, L13 - P165,L5; P170, L9 - P172, L20; P174, L9 - P176, L5; P190, L14 - P193, L3; P200, L5-P201, L16; P214,L10-P216,L8; P217, L20 - P219, L12; P225, L6 - P227, L23.

Avram M. Horowitz (April 22, 2002)(in its entirety, less p.18, L.6-L.19).

Craig Ziegler (2/26/98), P71, L9 - P 72, L7.

Bruce Burke (9/23/97), P75, L12 - P75, L19.

Bruce Burke's trial testimony (10/20/98), Tr. 1634, L21- 1636, L23; Tr. 1639, L16-20; Tr. 1640, L17 - 1645, L16; TR. 1673,L.16-TR. 1675., L 3..

Kim Trial testimony, Tr. 1353, L 1-10; 1548, L. 2-8.

Krieger deposition (5/2/02), TR. 4, L. 8-TR.31, L. 9; TR. 65, L.8-L.19; TR. 86, L.11-TR.

87, L4.

Haber/DDC deposition ( 4/16/02), TR.55, L16-TR. 58, L. 6.

Defendants' Position:

Defendants do not intend to use any depositions unless witnesses become unavailable to testify at trial. Defendants object to the reading of any deposition testimony. As to the deposition of Mr. O'Connell, he will be available to testify at trial. As to the depositions of Craig Ziegler and Bruce Burke, and to Mr. Burke's and Rhonda Kim's trial testimony, their testimony is the subject of a motion in limine by Defendants, and as such Defendants also object to their testimony for the reasons stated therein. Nevertheless, if the Court permits Plaintiff to read the deposition portions designated, Defendants will counter-designate portions of the deposition transcripts offered by the Plaintiff, and may designate other prior testimony in this case to counter Plaintiff's designations.

## XIII.   Other Pre-Trial Relief, Including Pending Motions

Plaintiff and Defendants both have motions in limine pending. Defendants also have pending a Motion for Partial Summary Judgment to Exclude Remote Revenues, and a Motion for Partial Summary Judgment to Exclude Plaintiff's Claim for Prejudgment Interest.

## XIV.   Schedule

Trial shall commence on July 16, 2002, at 9:30 a.m. The probable length of the trial is two weeks. Trial of this portion of the case shall be in accordance with the issues, stipulations and documents set forth in this order.

This matter having come before the Court at a pre-trial conference held on June 19, 2002, pursuant to Rule 16 of the Federal Rules of Civil Procedure,

IT IS HEREBY ORDERED, this _3rd_ day of _March_, 2003* that the foregoing pretrial order is approved and shall govern the course of the trial of this case on the issue of damages.

*NMAC produce to 6/11/02

_Marvin J. Garbis_
MARVIN J. GARBIS
UNITED STATES DISTRICT JUDGE

Submitted & Approved By:

Howard J. Schulman
Schulman & Kaufman, LLC
One Charles Center, Suite 600
100 N. Charles Street
Baltimore, Maryland 21201
(410) 576-0400
Attorneys for Plaintiff

George Beall
Hogan & Hartson, L.L.P.
111 South Calvert Street
Baltimore, Maryland 21202
(410) 659-2715

-and-

Robert L. Raskopf
Marc E. Ackerman
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036-2787
(212) 819-8200
Attorneys for Defendants